UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Case No. 1:99-cr-136 |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DIANA HARVEY JOHNSON | : | |
| _____ | : | |

## PETITION FOR A WRIT OF ERROR CORAM NOBIS
## AND MEMORANDUM OF LAW IN SUPPORT

Petitioner, Diana Harvey Johnson, moves this Court to set aside and vacate her judgment and convictions pursuant to a writ of error coram nobis, 28 U.S.C. §1651(a); *United States v. Morgan*, 346 U.S. 502, 506 (1954). As the Supreme Court held in *Skilling v. United States*, 130 S.Ct. 2896 (2010), the scope of activity proscribed by honest-services fraud, 18 U.S.C. § 1346, does not include liability for conflict of interest or undisclosed self-dealing. Even though Ms. Johnson was found guilty on both money and property and honest services provisions, the Government's case was exclusively built around the conflict of interest and undisclosed self-dealing theory. The evidence presented at trial focused on the same. Without the ability to introduce such evidence, the Government could not have made its case, and no charges would ever have been brought solely under the money-and-property provision. The entire Government's case was riding on the

coat tails of the honest services fraud involving conflict of interest and self-dealing activities.

Ms. Johnson is no longer in custody, she has been released from prison in 2004 after having served her sentence, and her supervised release has been terminated on March 18, 2006. She continues to suffer the collateral consequences of her wrongful conviction, and has no other remedy available to correct the errors of fundamental character that occurred in her case but for petitioning for a writ or error coram nobis.

In conclusion, Ms. Johnson's convictions should be set aside because the conduct underlying them were predicated upon the acts that were not crimes within the scope of 18 U.S.C. §§ 1341 and 1346.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

### a. The Charges

On March 16, 1999, Ms. Johnson, then a Georgia State Senator, was charged with five counts of mail fraud, in violation of 18 U.S.C. §§ 1341, 1346, and 2. (R1-1). The indictment alleged that Ms. Johnson defrauded the State of Georgia citizens of their: (1) right to honest services as an elected State senator; and (2) money and property through use of the United States mails. (*Id.*).  On March 23, 1999, Ms. Johnson entered a plea of not guilty. (R1-5). The case was tried before a jury beginning on July 7, 1999. (R1-71).

**b. The Government's Theory of the Case**

The primary theme of the Government's opening Statement was that Ms. Johnson had engaged in an undisclosed self-dealing as a State Senator. She furthered her own financial interests while purporting to act in the interests of her constituents, and, thus, committed honest services fraud:

> Now, this is a fraud case. It's a case about dishonesty, about deception and about abuse of trust by a State legislator who secretly used her public office to line her own pockets.
>
> That legislator if the defendant, Diana Harvey Johnson. . . And she is a State Senator from the Savannah area. And the evidence is going to show you, Ladies and Gentlemen, that Senator Johnson violated her duty to provide her honest services to the State of Georgia and the citizens of Georgia, her duty to act at all times in their best interests with no financial interests of her own, and her duty to disclose rather than to conceal any conflict of interest that might arise.

(R6-135). Although in passing the Government promised to prove that Ms. Johnson also sought to deprive the State and its citizens "of their money as well," (*id.* at 135), the main focus in the opening Statements was on her failure to disclose her financial interest in Greater Savannah Black Tourism Network (Greater Savannah) and Peach State Black Tourism Association (Peach State), her efforts to conceal that interest, her lobbying activities to obtain the State funds for those organizations, and her duties as a State Senator. (*Id.* at 136-69).

> Ms. Johnson was a legislator and she was also chairman of the legislative Black Caucus. And using those positions, she lobbied and voted for legislation that directed State money to two non-profit organizations. That money was to be used to promote African-American tourism.
>
> Now, completely unknown to the State, Senator Johnson controlled those organizations. She directed how they would spend their money. And the evidence will show you that once the State money got to those organizations, Senator Johnson could do with it as she wanted. And what she did with much of that money was to funnel it through those organizations to herself.

(*Id.* at 136). The Government continued weaving the non-disclosure, self-dealing,

and concealment theory:

> Now, the evidence is going to show you that as she was lobbying and voting to get this State money to her organizations, she never told the State and she never told the public that she expected that some of that money would end up in her own pocket.
>
> Instead from the very beginning, you'll see that she tried to conceal her control over those organizations and over their finances. She did it by using a variety of false Statements, false documents, and forged signatures.
>
> . . .
>
> And as you listen to the evidence and as you hear about the false Statements and you see the documents and the forged signatures, ask yourselves, are these actions consistent with somebody acting innocently and in good faith. The evidence will show you that the answer is no, they're the actions of somebody trying to deceive, somebody with intent to defraud.

(*Id.* at 137-38).

> What she did is during the legislative session in early 1994 she managed to get $5,000 put into the State budget for the supplemental fiscal year 1994. It was put in there not as money that could be spent in any way by the tourism department, but as money that had to go directly to something called the Georgia Black Tourism Network. And Senator Johnson voted for that budget on February 4th, 1994, without disclosing any personal interest that she had in that tourism component.

(*Id.* at 143).

> Well. The evidence will show you that Senator Johnson was working to set up black tourism networks around the State, but that the people involved in the meetings she was at thought she was working as an unpaid volunteer just like they were. They were all volunteers. And you'll see that she was listed on meeting agendas as an advisor, or as a State representative Diana Harvey Johnson, never as a paid consultant.
>
> . . .
>
> You're going to see the beginnings of a pattern. Senator Johnson wanted to be paid. And so she arranged to have her company paid with no formal proposal, no contract, no invoices, and no review of the value of her work, by the officers or the staff or the directors of Greater Savannah. And of course, with no disclosure that she was receiving the State money.

(*Id.* at 147). The Government also extensively talked about the African-American

tourism brochure project that Ms. Johnson brokered between the State and Greater

Savannah misrepresenting who would be doing the actual work. (*Id.* at 147-49). It

further described Ms. Johnson's efforts to conceal her financial interest in the

Peach State:

> But again despite her involvement in and control of Peach State, she never held an office on paper. Not an officer, not even on the bard of directors. She called herself just an advisor.
>
> The evidence will show you that she had to conceal her control of Peach State from the State of Georgia because the State was again going to be the source of the organization's money, as a result of Senator Johnson's exercise of her official position as a public official.

(*Id.* at 150). Again, the Government emphasized Ms. Johnson's duty to disclose

her financial interest in Peach State:

> . . . The Caucus members, the legislators and the other State officials that were considering the Peach State proposal would have wanted to know if Senator Johnson had a personal financial interest in the proposal. They would have wanted to know that before they put their own support behind the plan.
>
> Instead, unaware of that conflict of interest, Government Miller included the Peach State proposal in his 1996 budget report. And by getting into the budget report, it made it very likely to pass on the floor of the legislature and to be continued in the State's budget from year to year.
>
> And on March 17th of 1995, Senator Johnson voted for that State budget that included $300,000 that was going to go to the organization she controlled.

(*Id.* at 151-52). The Government further focused on Ms. Johnson's efforts to conceal the payments made to her companies, recreating invoices, and back-dating various documents. (*Id.* at 161-68). After long winding arguments, spanning over thirty pages, on Ms. Johnson's self-dealing and failure to disclose the conflict of interest, the Government's allegations about the money and property fraud boiled down to the following:

> Now you'll hear that she set the salary for the full-time professional executive director at $38,000 a year. And keep in mind as you decide whether Senator Johnson earned the $75,000 that she received from Peach State just -- just over a year.

(*Id.* at 153).

> And ask yourself whether Senator Johnson really earned the money that she was paying to her company. You're going to hear that there were no contracts between Peach State and Greater Savannah or between Greater Savannah and C.A.A. and that at the time these checks were written there were no invoices.

(*Id.* at 158). Finally, the Government concluded: "In the end, Ladies and Gentlemen, the evidence is going to show you that Senator Johnson had a very serious conflict to the State and to the citizens of this State, and by doing that, she defrauded them of their right to her honest services as a public official." (*Id.* at 168). And then, as its "insurance policy" added: "And the evidence will also prove to you that while Senator Johnson did some work for Greater Savannah and Peach

State, she did not come close to earning the $80,000 that she received in State money." (*Id.*).

In conclusion, the record reveals that the Government's case rested on the honest services fraud theory, which involved neither bribes nor kickbacks, in violation of *Skilling*.

**c. The Evidence at the Trial**

Ms. Johnson's trial lasted for ten days, resulting in nine volumes of trial transcript, totaling 1,688 pages. *See* Docs. 124-133. The Government's focus on the honest services fraud theory continued during the presentation of evidence. The Government showed that as a legislator and the chairman of the legislative Black Caucus, Ms. Johnson lobbied and voted for the legislation directing the State moneys to two non-profit organizations that she controlled, Greater Savannah and Peach State.

In 1994, Ms. Johnson lobbied for $5,000 to be added into the State's Supplemental 1994 budget. (R8-512; R9-673). Those funds were earmarked for the development of Greater Savannah through the Georgia Department of Industry, Trade, and Tourism (Tourism Department). (R9-673). Ms. Johnson recruited most of Greater Savannah's Board members and selected its officers. (R7-215-17; R9-709). In May 1994, the Tourism Department contracted with Greater Savannah to pay for the expenses associated with the development of black tourism

organizations in six Georgia cities. (R11-1014-19). Out of this amount, $4,000 was paid to CAA Consulting Corporation (CAA Consulting), Ms. Johnson's sole proprietorship for the services it had rendered to Greater Savannah. (R9-718-20). The Tourism Department has decided that Greater Savannah *has earned* $5,000 for the services it had performed, although it was not aware "who was actually doing the work that earned the $5,000." (R11-1017-19).   The Government presented cumulative evidence concerning Ms. Johnson's failure to disclose her interest in Greater Savannah or CAA Consulting, that she was getting paid through these organizations, and her efforts to conceal her interest. (R7-312; R9-716-17, 720-28; R10-926-28, 952; R11-1018-1020, 1027, 1046).

In May 1994, Ms. Johnson arranged for the Tourism Department to enter into a $4,200 contract with Greater Savannah to produce six African American heritage brochures. (R10-924-27; R11-1028). The Government also introduced evidence that Ms. Johnson misrepresented to Hanna Ledford, the director of the Tourism Department that Julia Wright would be working on the project. (R10-925). Instead, it was Ms. Johnson, who, together with the Tourism Department staff, worked on the brochures, and Greater Savannah paid her $4,200. (R7-235, 347; R8-630; R9-726, 673, 813-14; R11-1019, 1028-30). The Tourism Department believed that Greater Savannah *earned the money* based on the final product. (R11-1019). **Count Two** of the indictment was based on Ms. Johnson's mailing of a

brochure proof to the Tourism Department's graphics artist who coordinated the project. (Doc. 1 at 20; R11-1028-31).

In early 1994, Ms. Johnson began organizing Peach State, a non-for-profit group, to promote black tourism in Georgia. (R7-244-45). Ms. Johnson recruited its Board members and officers, and also set the staff's salaries. (*Id.* at 245-46, 255-56). She lobbied for the State funding for Peach State using her official position, without ever disclosing her personal interest in the organization. (R7-249; R10-886, 899-900, 963-64; R11-1045-46, 1053-54, 1075-80; R13-1289-92, 1295-97). In 1995, Ms. Johnson voted for a State budget, which included $300,000 grant earmarked for Peach State Black Tourism Association. Government Exhibit (Gov. Exh. 4). On September 1, 1995, the Tourism Department and the Peach State entered into a service agreement in the amount of $300,000. (R7-250, 252). The Tourism Department agreed to pay Peach State the consulting fees of up to $300,000. (*Id.* at 260-61). On October 26, 1995, Peach State mailed the Tourism Department the signed contract and a budget, which did not mention any payments to Ms. Johnson, Greater Savannah, CAA Consulting, or Rainbow services.[1] (R7-262-64). This mailing was charged in **Count One** of the indictment. (R1-1).

At sentencing, the Government claimed that from the $300,000 grant Ms. Johnson was paid a total of $75,439.50, but it estimated that her services were

---

[1] Another business that Ms. Johnson controlled.

worth only $53,833. (Doc. 134 at 13). Thus, Ms. Johnson allegedly overcharged the State by $21,606. (*Id.*). At trial, however, the Government only presented the evidence that money were transferred from the Peach State to Greater Savannah, and from Greater Savannah to the CAA Consulting, without any showing that the money were not legitimately earned. (R7-243-44; R9-738-59, 764, 773, 783-84; R10-865-74, 878, 881-83, 961, 1061; R11-1090-91, 1117-18, 1297; R12-1211-18, 1248-1250, 1252-54).

The record revealed that Kelvin Willis, the Peach State executive director, unexpectedly passed away in September 15, 1995, after having worked there for a month, and his brother Stacey Copeland replaced him on January 2, 1996. (R7-273-74; R11-1088, 1140-41, 1145). Copeland had no experience in the tourism industry. (R7-274). The evidence also revealed that Ms. Johnson: (1) was an advisor to the Peach State (R7-246-47, 256; R9-732) and even worked on its matters on the evenings and weekends (R7-373-76, 408); (2) was knowledgeable in business management, history, and black tourism (R7-376-81); (3) helped organizing the multi-cultural tourism conference in the Spring of 1996 (R7-350, 287-88; R8-557, 562-63; R9-830-33; R13-1398, 1403-04) and many other events (R7-269, 276, 295, 353; R9-661); (4) recruited employees and consultants (R7-253-55, 274, 278-79; R8-450, 456, 558); (5) prepared newsletters (R7-348); (6) designed membership certificates and membership packets (R7-348-49); (7)

advertised, co-sponsored, and did the majority of the work for the 1996 West Broad Street Reunion festival and workshops (R7-349, 352, 401-02; R8-442); (8) acted as a de facto executive director before Copeland assumed his duties (R7-265-67, 325-26, 407-09; R8-447); and (9) even during Copeland's tenure "had to do a lot of work because Stacey" was failing at his job (R7-350-51; R8-630; R11-1151, 1177, R13-1400, 1408).

Throughout the trial the Government focused on the theory that Ms. Johnson never disclosed her financial interest in the Peach State, and her status as a paid consultant was not revealed to the Peach State Board or staff, or to any State official. The Government endlessly quizzed the witnesses about Ms. Johnson's non-disclosure and her efforts to conceal her financial interest in the organization. *See* Testimonies of Betty Simmons (R7-239, 243, 251-52, 264-67, 270-71, 283-85, 288-89, 293-95, 300, 312, 315-17, 330, 341, 348-50, 352-56, 358, 363; R8-502-04); Caletha Powell (R8-541-43, 548, 561, 563, 569, 571-75, 606); Tonya Thomas Douglass (R8-618-21, 622-23); Karl Douglas (R9-640, 642-44, 648-50, 661-62); Georganna Sinkfield (R9-673, 676-77, 679, 681, 683-84); Julia Wright (R9-709-11, 713-16, 718, 738-39, 741, 744-45, 749, 751-54, 757-58, 773, 777, 837-38); Sandra Putnam (R10-863, 871); Keith Heard (R10-887, 891, 898-900); Hanna Ledford (R10-919-21, 923-24, 930-31, 934, 941-43, 948-49, 960-61, 963-64); Terry Gandy (R11-1048-50, 1056); Daniel Ebersol (R11-1078-80); Tammy

Whitehead (R11-1090); Aileura Crawford (R11-1118-19); Stacey Copeland (R11-1143-44, 1148-54, 1156-59, 1161); Catherine Baker (R11-1187); Beverly Curry (R11-1199-1201; R12-1213-17); Greg Ellison (R12-1233, 1235, 1239-41, 1245-54, 1260-61); and Zell Miller (R13-1293, 1295-97).

In addition, the Government presented many witnesses to testify about Ms. Johnson's lobbying efforts to obtain financing for black tourism development. *See* Testimonies of Georganna Sinkfield (R9-673, 675, 681-82, 703); Keith Heard (R10-888, 890); Hanna Ledford (R10-917-922, 931-33); Terry Gandy (R11-1045); Daniel Ebersol (R11-1075-78); and Zell Miller (R13-1289-91). Finally, the Government brought in witnesses for the sole purpose of testifying about the grants included in the State Budget, and how Ms. Johnson had voted on the State Budget. *See* Testimonies of Robbie Rivers (R8-508-13); Bill Tomlinson (R8-525-28).

The Government presented the following evidence with regard to the **Count Four** of the indictment. On March 16, 1996, Ms. Johnson, without disclosing her conflict, voted in favor of the State budget for fiscal year 1997, which included another $300,000 earmarked for the Peach State. (R8-526). However, before the additional funds could be could be paid, the Peach State had to provide the marketing plan and budget outline for 1996-97 to the Tourism Department. (R10-957-58). On November 26, 1996, the Peach State did so, but the documents again

failed to mention "services by or payments to Greater Savannah or Senator Johnson or CAA." (R10-958).

On December 11, 1996, the Peach State mailed a marketing plan and budget outline for 1997-98 to the Office of Planning and Budget. (R7-297; R11-1059). Again, the main offense, the Government claimed, was the failure to disclose the connection between the Peach State and Ms. Johnson in those documents. (R11-1056-60, 1071).  This mailing was charged in **Count Five** of the indictment. (R1-1).

In March 1996, news agencies started investigating Ms. Johnson's connections with Greater Savannah. (R7-303-04). Ms. Johnson addressed the news reports and defended the $5,000 contract between the Tourism Department and Greater Savannah in a letter to then-Governor Zell Miller and other State officials. (R7-304-07; R8-442; R11-1119-20). All of the information in the letter was correct. (R8-442-45). However, the Government emphasized that the letters did not disclose Ms. Johnson's financial interest in Greater Savannah (*id.*).  The mailing to the Governor was charged in the **Count Three** of the indictment. (R1-1).

**d. The Closing Arguments**

The Government reiterated and emphasized its honest services fraud theory during closing arguments:

> Now, at the beginning of this trial, I told you that this was a fraud case. I told you that this case was about

> dishonesty, deception and abuse of trust by a State legislator who secretly used her public office to line her own pockets.
>
> And that is exactly what the evidence has proved. Diana Harvey Johnson used her public position as a State legislator to get State funding for Greater Savannah and for Peach State. And then she used her secret financial control over those two organizations to direct more than $80,000 of that State money to herself.
>
> And rather than openly and honestly disclosing her financial interest in Peach State and Greater Savannah, Senator Johnson went to great lengths to hide the truth. She used false Statements. And she used her influence over people who respected and trusted her . . .

(R13-1545). Although in passing the Government Stated that there were "two types of fraud in this case," it decided to "focus almost all [of its] attention" on the honest services fraud "because in cases involving public officials, it's by far the most important." (*Id.* at 1546). The Government's closing argument concerning the honest services fraud spanned over twenty-five pages of the transcript. (*Id.* 1546-1571). In particular, it concentrated on Ms. Johnson's "legal duty to act honestly and faithfully and in the best interests of her employer, the State of Georgia and the people of Georgia," (*id.* at 1546), and making a full disclosure of her financial interests. Examples of the prosecutors' Statements made during closing arguments include the following remarks:

(1) "Under the law, everyone who represents or works for someone else has a duty to act honestly and faithfully in all her dealing and to perform all her services in the best interests of the employer. That is what the law is." (*Id.* at 1546);

(2) "When you are working for someone else, your duty is to act in their best interest, not your own financial interests. You have to put those interests aside." (*Id.* at 1546);

(3) "And that is especially true of our elected officials because in our country our elected representatives have a duty to act for the benefit of everyone at all time, in our best interest, putting their own personal financial interests to the side." (*Id.* at 1546);

(4) "So whenever Senator Johnson was acting as a State legislator, using the power and influence and the connections that come with that position, she had a legal duty to act honestly and faithfully in the best interests of her employer, the State of Georgia and the people of Georgia." (*Id.* at 1546);

(5) ". . . Senator Johnson's duty to provide honest services included a duty to fully and fairly disclose any conflict of interest that she had or expected to have." (*Id.* at 1546-47);

(6) "And a conflict of interest is just a personal interest or profit that she either expected to receive or had already received in any matter that she was participating as a State legislator." (*Id.* at 1547);

(7) "The State and the public have the right to know when a legislator actually has some personal private financial interest in a matter." (*Id.* at 1547);

(8) "The important thing is the full and fair disclosure, putting the information out there. So that the other State officials can make their decisions with all the relevant and important information." (*Id.* at 1547);

(9) "And so undisclosed conflict of interest is a violation of the right to honest services." (*Id.* at 1547);

(10) "If Senator Johnson did not intend to deceive and defraud the State by hiding her financial interests in Greater Savannah and Peach State, then why did she do everything she did?" (*Id.* at 1547-48).

Next, the Government described Ms. Johnson's specific instances of self-dealing and efforts to conceal them:[2]

(1) "And Senator Johnson voted for that supplemental budget on February 4th, 1994, without ever telling anyone that she had a financial interest, that she expected to gain from that money." (*Id.* at 1548);

(2) "Now, to get the money from the State, she had to submit a proposal letter and get a contract." (*Id.* at 1549). "You'll see that Senator Johnson wrote the proposal letter." (*Id.*). "But then she realized that wouldn't work." (*Id.*). "She couldn't send the letter in her own name to Hanna Ledford to get State money." (*Id.*). "And

---

[2] The Government's comments are too numerous to list them all. *See generally* R14-1548-1579.

you'll see that she had the draft retyped and the letter that was sent to the department swapped out her name for Julia Wright." (*Id.* at 1549-50);

(3) "You've seen that Senator Johnson set up greater Savannah so she could control the organization without ever holding a formal position. She did that on purpose so her name wouldn't be on record so there wouldn't be a paper trail that led back to her." (*Id.* at 1550);

(4) ". . . And at every one of those meeting she appeared . . . as a State legislator. She held herself out as a legislator, maybe an advisor. Never as a paid consultant." (*Id.* at 1551);

(5) "And she used her influence and her connections as a State legislator to get her fellow officials . . . to participate in these meetings to support the concept. And she paid herself $4,000 of the $5,000 for that." (*Id.* at 1551);

(6) "Then came the $4200 brochure contract." (*Id.* at 1551). "And she again had Julia Wright sign the letter, even though Julia Wright didn't know anything about it. . . Neither did the bard of Greater Savannah." (*Id.* at 1551-52);

(7) "And Senator Johnson had another opportunity to tell the truth, to admit, I'm going to do the writing. But she didn't. Instead she falsely claimed that Julia Wright was going to do the writing. . ." (*Id.* at 1552);

(8) "Now, by the time that contract for 4200 was signed in September of 1994, Senator Johnson already had the $4,000 from the first State contract in her pocket.

But instead of disclosing that conflict of interest, she forged Julia Wright's name on the $4,200 contract and she sent it in to the department." (*Id.* at 1552).

The Government conceded that Ms. Johnson "did some work" that "was worth something." (*Id.* at 1571). It also conceded that the $5,000 contract between the State and Greater Savannah was not "at issue for the money and property theory" because the State "had gotten its money's worth on those projects." (*Id.* at 1572). Then, the Government only "briefly" summarized its money and property theory for the jury:

> For the money and property fraud, the question is the Peach State money, the $75,000 that got funneled through Greater Savannah and Rainbow. The question is whether Senator Johnson intended to provide services worth the whole $75,000. And that issue is raised in this case because somebody has got to decide it. No one ever has before because Senator Johnson never let anybody. She never let anyone else evaluate the value of her work.

(*Id.* at 1571-72).

> So while nobody disputes that Senator Johnson did some work for Peach State, the evidence shows that she did not provide services worth the full $75,000 that she took. And she never intended to. Instead, she used her complete control over Peach State to take what she wanted when she wanted. And that, Ladies and Gentlemen, is money and property fraud.

(*Id.* at 1575). Next, the Government argued that the mailings charged in the indictment helped to execute the scheme to defraud:

> All we have to prove to you that the mailings were related to the scheme and that Senator Johnson could foresee that they would be made in the ordinary course of business.
>
> . . .
>
> Count two relates to the brochure contract, the $4,200. Count one, there were the documents, the final documents that had to be sent in to the Department so that they would release the first $300,000, the signed contract amount.
>
> Now, three is the letter that was sent to Governor Miller in Betty Simmons' name to falsely indicate there was no connection between Greater Savannah and the senator. That is called the lulling letter, lulling people into believing that there is no fraud going on.
>
> And count four and five are the marketing budget outlines. . .

(*Id.* at 1576-77). Finally, in its rebuttal, the Government concluded: "This case is about the abuse of . . . trust." (*Id.* at 1648).

### e. The Jury Charges, Verdict, and Sentence

Although the district court instructed the jury that the verdict form encompassed both the honest services and money and property fraud theories, the court spent considerably more time instructing the jury on the honest services than the money and property fraud. (R14-1659-64; *compare* R14-1659-62 *with* R14-1662). Specifically, with regard to the money and property theory, the court gave the following brief instruction:

Now, with regard to the money or property fraud theory, the Government *is not required to prove that the defendant did no work or performed no services for the money she received. Nor is the government required to prove that the State lost any particular amount of money*. The issue is whether the defendant knowingly devised or participated in a plan or course of action intended to deceive or cheat the State out of money or property by means of false or fraudulent pretenses, representations or promises.

What the Government must prove is that the defendant intended to provide services that were not worth the full amount of money that the defendant received, with the specific intent to defraud the State.

(*Id*. at 1662) (emphasis added).  On another hand, the instructions about the honest

services fraud, in relevant part, provided:

Now, under the law, every agent or employee representing or working for someone else, that is the employer, has a duty to act honestly and faithfully in all of his or her dealings with the employer and to perform his or her services in the best interests of the employer, including *a duty to make full and fair disclosure* to the employer of any personal interest or profit that the employee expects to derive or has derived from any transaction in which he or she participates in the course of the employment.

Thus, a State official's affirmative duty to disclose material information need not be expressly Stated by the State. It may instead be implied in the relationship between the parties, such as a government official's fiduciary relationship to his or her employer.

Now, Ladies and Gentlemen of the jury, the duty of a State legislator to provide honest services includes . . . *a duty to make full and fair disclosure to the State of*

*any personal interest or profit that the legislator expects to derive or has derived from any transaction in which he or she participates in the course of and as a part of his or her public employment.*

*The duty to disclose applies to both direct and indirect conflicts of interest,* and to be effective, the disclosure must be complete with no material omissions. The duty would apply to indirect conflicts provided that the indirect conflicts were an essential part of the scheme to defraud.

Now the Government is not required to prove that the defendant knew that the law required her to disclose all material information to the State because ignorance of the law is not a defense to mail fraud.

Rather what the government must prove is that the *defendant failed to disclose material information such us a conflict of interest,* and the defendant acted with the specific intent to deceive the State and its citizens and thereby deprive them of their right to her honest services.

A conflict of interest is any personal interest or profit a State legislator expects to derive or has derived from any transaction in which he or she participates in the course of and as a part of his or her public employment.

The Government must prove that the legislator participated in the matter without disclosing his or her conflict of interest with the specific intent to defraud.

The Government is not required to prove that the legislator's influence or vote was decisive on the issue. The honest services fraud theory does not require the government to prove that the State actually lost any money as a result of the alleged scheme to defraud. Nor does the government have to prove that the legislator would have been prohibited from participating in the

matter if he or she properly disclosed the conflict of interest.

The law of honest services is not concerned with the wisdom or the result of the government's decisions, but rather with the manner in which the Government makes its decisions, including the right of the decision makers to know off of the material facts before making a decision.

*The government must prove that at the time the defendant had a conflict of interest and failed to disclose it*, that she had the intent to defraud the State and its citizens of their right to her honest services. A conflict of interest may occur at any time a legislator acts in her capacity as a public official.

A legislator owes a duty of honest services to the State whenever she is acting in her official capacity.

(*Id.* at 1659-62 (emphasis added)). The district court did not instruct the jury that an honest services scheme to defraud required bribery or a kickback, as now required under *Skilling*. The defense objected to the jury instructions on the conflict of interest: "As to that portion of the court's charge that said a conflict of interest may occur at any time a legislator acts in her capacity as a public official, I disagree that that is the law." *Id.* at 1669.

The jury convicted Ms. Johnson on all five counts on July 21, 1999. (Doc. 106). It found Ms. Johnson guilty under both the honest-services and the money-and-property provisions of the mail fraud statute. (*Id.*). The district court sentenced Ms. Johnson to 41 months' imprisonment on each count, to run concurrently, and three years' of supervise release. (Doc. 113). The court also imposed a special

assessment of $500, a fine of $7,500, and ordered Ms. Johnson to pay restitution of $21,606 to the State of Georgia's Office of Treasury and Fiscal Services. (*Id.*; *see also* Doc. 134 at 57).

**f. Post-conviction Proceedings**

Ms. Johnson timely appealed her conviction and sentence to the Eleventh Circuit Court of Appeals. (Doc. 117). Among other things, she raised the sufficiency of the evidence challenge to her convictions and also claimed that the mail fraud statute was unconstitutionally applied to impose a duty to disclose. The Eleventh Circuit affirmed in an unpublished opinion, and the Supreme Court denied review. (Doc. 136; *see also Johnson v. United States*, 533 U.S. 915, 121 S. Ct. 2519 (2001)). Finally, the district court denied Ms. Johnson's *pro se* 28 U.S.C. § 2255 motion to vacate her sentence. (Docs. 141, 145).

Ms. Johnson was released from prison in 2004.[3] She satisfied the monetary portion of the judgment, and her supervised release was terminated in 2006. (Docs. 147, 148).

---

[3]http://www.bop.gov/iloc2/InmateFinderServlet?Transaction=NameSearch&needingMoreList=false&FirstName=diana&Middle=&LastName=johnson&Race=B&Sex=F&Age=&x=60&y=23.

## LEGAL ANALYSIS AND CITATION OF AUTHORITIES

**a. *Skilling Decision***

In 2010, in response to continuing confusion in the lower federal courts over how to interpret the honest services statute, the Supreme Court heard three cases that addressed the issue of what constitutes honest services fraud.[4] The Court held that 18 U.S.C. § 1346 only criminalized bribery and kickback schemes. *Skilling*, 130 S. Ct. at 2907; *see also Black v. United States*, 130 S. Ct. 2963, 2968 (2010) (confirming *Skilling's* holding that "§ 1346 properly confined, criminalizes only schemes to defraud that involve bribes and kickbacks"). The statute was narrowly construed because "[r]eading the statute to proscribe a wider range of offensive conduct . . . would raise the due process concerns underlying the vagueness doctrine," concerns exquisitely exemplified by Ms. Johnson's case. *Skilling*, 130 S. Ct. at 2931. Thus, the Supreme Court preserved the honest services statute by explicitly narrowing its scope.

The Eleventh Circuit applied the Supreme Court's ruling to the honest services statute in *United States v. Davidson*, 399 Fed.Appx. 525 (11th Cir. 2010), in which it reversed a conviction for honest services fraud because the activity

---

[4] The other two cases were *Black v. United States*, 130 S. Ct. 2963 (2010) (finding a breach of the duty of loyalty is not an honest services fraud violation) and *Weyhrauch v. United States*, 130 S. Ct. 2971 (2010) (remanding the admission of evidence against an Alaska State legislator who failed to disclose a conflict of interest which is not a violation of the honest services fraud statute).

alleged was undisclosed self-dealing rather than bribery or kickbacks. Further, at least one district court in this Circuit has granted a coram nobis relief under similar circumstances of this case. *See United States v. Lopez-Lukis*, Case No. 2:95-cr-00004, Doc. 284 (M.D. Fla. 2011) (granting coram nobis relief where the petitioner, then the County Commissioner, was convicted for mail fraud under honest services theory for lying to the press and the public about her illicit love affair with the lobbyist).

In addition, other circuits and courts have similarly applied *Skilling* to exclude dishonest conduct, other than bribery or kickbacks, by public officials from the ambit of the statute. *See e.g.*, *United States v. Riley*, 621 F.3d. 312, 324 (3rd Cir. 2010) (reversing an honest services statute conviction on appeal, which failed to allege a bribe or kickback); *United States v. Weyhrauch*, 623 F.3d 707 (9th Cir. 2010) (rejecting the admission of evidence solely to prove an honest services statute violation for concealing a conflict of interest); *Geddings v. United States*, 2010 WL 2639920 (E.D.N.C. June 29, 2010) (granting post-conviction relief to a lottery official convicted of honest services fraud based on a theory of undisclosed self-dealing).

*Skilling* type errors are subject to harmless error analysis. *Skilling,* 130 S. Ct. at 2934; *see also Yates v. United States*, 354 U.S. 298, 77 S. Ct. 1064 (1957) (constitutional error occurs when a jury is instructed on alternative theories of guilt

and returns a verdict that may rest on a legally invalid theory); *see also Hedgpeth v. Pulido*, 555 U.S. 57, 60-61 129 S. Ct. 530 (2008) (these constitutional claims, or *Yates* errors, are subject to harmless error analysis). The burden is on the petitioner to show entitlement to relief in a petition for a writ of error coram nobis. *See Moody v. United States*, 874 F.2d 1575, 1578 n. 6 (11th Cir.1989).

The Government has the opportunity to demonstrate that a *Yates* error was harmless. *Skilling*, 130 S. Ct. at 2934. In the habeas context, the Government can demonstrate that a *Yates* error was harmless if it did not have "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623, 113 S. Ct. 1710 (1993) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239 (1946)); *see also Peter*, 310 F.3d at 712 (characterizing coram nobis as a form of collateral relief).

## b. A Writ of Error Coram Nobis

The All Writs Act, 28 U.S.C. § 1651(a), gives federal courts the authority to issue a writ of error coram nobis. *United States v. Mills*, 221 F.3d 1201, 1203 (11th Cir. 2000). Whether to grant a writ of coram nobis is committed to the sound discretion of the district court. *Alikhani v. United States*, 200 F.3d 732, 734 (11th Cir. 2000). A writ of coram nobis "is an extraordinary remedy of last resort available only in compelling circumstances where necessary to achieve justice." *Mills*, 221 F.3d at 1203. A court's jurisdiction over coram nobis petitions is limited

to review of errors of fact of the most fundamental character when no other remedy is available or adequate. *Id*.

To be entitled to a writ of coram nobis, petitioner must show the following. First, she was not in custody at the time she filed the petition. *United States v. Peter*, 310 F.3d 709, 712 (11th Cir. 2002). Second, there is and was no other available and adequate avenue of relief. *Alikhani,* 200 F.3d at 734; *Mills*, 221 F.3d at 1204. Third, the error alleged "[i]nvolves a matter of fact of the most fundamental character which has not been put in issue or passed upon and which renders the proceeding itself irregular and invalid." *Alikhani*, 200 F.3d at 734 (citing *Moody*, 874 F.2d at 1576-77). Fourth, there are sound reasons for failing to seek relief earlier. *Mills*, 221 F.3d at 1204. Finally, the petitioner must show that the collateral consequences of conviction persist beyond confinement. *Peter*, 310 F.3d at 712.

Ms. Johnson meets this test. First, she is no longer in custody, having been released from prison on April 6, 2004. Second, because Ms. Johnson is no longer in custody, coram nobis is the only remedy available to her after the Supreme Court's holding in *Skilling*, *i.e.*, the grounds to attack her convictions became available after she had served her sentence. Third, the proceedings against Ms. Johnson were rendered "irregular and invalid" by deficient charges in the indictment, overwhelming evidence at trial of conduct that was not even a crime,

and erroneous jury instructions.[5] Fourth, Ms. Johnson has never procedurally defaulted her claims. *See* Docs. 136, 141, 145; *see also Johnson v. United States*, 533 U.S. 915, 121 S. Ct. 2519 (2001). Finally, Ms. Johnson continues to suffer the adverse effects of her convictions, which include harm to her reputation, loss of various civil rights, including her rights to vote, hold office, and carry a weapon. In addition, there is a "presumption of significant collateral consequences" arising from a criminal conviction. *Spencer v. Kemna*, 523 U.S. 1, 12, 118 S. Ct. 978 (1998), citing *Sibron v. New York*, 392 U.S. 40, 55, 88 S. Ct. 1889 (1968).

 "One type of claim that has historically been recognized as fundamental, and for which collateral relief has accordingly been available, is that of 'jurisdictional' error." *Peter*, 310 F.3d at 712; *see, e.g., United States v. Addonizio*, 442 U.S. 178, 185, 99 S. Ct. 2235 (1979) ("Habeas corpus has long been available to attack convictions and sentences entered by a court without jurisdiction."). Since jurisdictional error implicates a court's power to adjudicate the matter before it, such error can never be waived by parties to litigation." *Peter*, 310 F.3d at 712.

In *Peter*, the Eleventh Circuit held that when the Supreme Court defines a federal criminal statute to exclude the conduct upon which a conviction is based, there is a fatal jurisdictional defect, and "a writ of error coram nobis must issue to correct the judgment that the court never had power to enter." *Id.* In *Peter*, the

---

[5] This requirement will be discussed in more detail below.

defendant had pled guilty to violating the Racketeer Influenced and Corrupt Organizations Act ("RICO") based on his admission that he committed mail fraud under 18 U.S.C. § 1341 when he mailed applications for alcoholic beverage licenses with misrepresentations. *Id*. Four years later, the Supreme Court held in *Cleveland v. United States*, 531 U.S. 12, 121 S.Ct. 365 (2000), that "[s]tate and municipal licenses in general. . . do not rank as 'property' for purposes of § 1341, in the hands of the official licensors." *Peter*, 310 F.3d at 711. The *Peter* court held that "[d]ecisions construing substantive federal criminal statutes must be given retroactive effect" and voided Peter's conviction under *Cleveland*. *Id*. (citing *Bousley v. United States*, 523 U.S. 614, 620-21 (1998)). A court that convicts and sentences a defendant for conduct that is not in fact a crime lacks jurisdiction, and "the conviction and sentence are void from their inception and remain void long after a defendant has fully suffered their direct force." *Peter*, 310 F.3d at 715. Because the Supreme Court had defined the RICO statute in a way that rendered Peter's conduct non-criminal, the district court was without legitimate authority or jurisdiction to enter a judgment of conviction for that conduct, and a writ of coram nobis had to issue in order to correct the miscarriage of justice.

### c. Fundamental Error in this Case

Ms. Johnson's 1999 convictions should be vacated for the following reasons. First, the jury relied on an unlawful basis in convicting Ms. Johnson. Just like

Peter, who pleaded guilty to the facts that did not constitute a crime under *Cleveland*, Ms. Johnson was convicted of a specific conduct, *i.e*, self-dealing and conflict of interest, that "was outside the sweep of the charging statute," as decided by *Skilling*. *See Peter*, 310 F.3d at 711, 713-14. The record reveals that the honest services fraud invalidated by *Skilling* was the central focus of the indictment, the evidence, the Government's theory of guilt, and the jury instructions. The money and property objective was merely a "fig leaf" and the "insurance policy" for the Government. Every single witness testified about Ms. Johnson's self-dealing, conflict of interest, and her efforts to conceal that. The evidence of money and property fraud, on the other hand, was marginal at best. The simple truth is that the Government would have not had a case against Ms. Johnson without the self-dealing and conflict of interest evidence. By the Government's own admission, it "focus[ed] almost all [of its] attention" on the honest services fraud "because in cases involving public officials, it's by far the most important." R14-1546.

Second, the error was not harmless as it clearly contributed to Ms. Johnson's conviction. Although the verdict form encompassed both the honest services and money and property fraud theories, this court must evaluate the error in the full context of the trial and go beyond a mechanical analysis of the verdict form. The government will be unable to demonstrate that the *Yates* error here did not have "substantial and injurious effect or influence in determining the jury's verdict." *See*

*Brecht*, 507 at 623, 113 S. Ct. 1710. As argued above, the plain reading of the record reveals that Ms. Johnson's convictions were based on the conflict of interest and self-dealing theories of liability foreclosed by *Skilling*, and not on money and property fraud. Further, the "injurious effect" of "spillover" prejudicial evidence is undeniable. The self-dealing, conflict of interest, and concealment evidence was highly inflammatory, and thus prejudiced the jury against Ms. Johnson. Much of the evidence presented and almost all of the arguments of Government counsel during the trial would have been inadmissible and improper had Ms. Johnson been charged with money and property fraud alone. The evidence would have been limited solely to examining the work she did for Peach State, and the value of that work. All the evidence concerning her duty to disclose and efforts to conceal her financial interest in Greater Savannah and Peach State would have been eliminated.

## **CONCLUSION**

It cannot reasonably be disputed that the Government tried this case on an honest services fraud theory. Any charges regarding money and property fraud were little more than afterthoughts in the Government's presentation. Honest services fraud was the sum and substance of Ms. Johnson's prosecution and the jury's conviction of her. Ms. Johnson is actually innocent of any honest services fraud charge, and allowing the jury verdict to stand would demean the judicial

system, undermine the fairness, integrity, and public reputation of this Court. Ms. Johnson is entitled to retroactive relief from the remaining consequences of her convictions, and "a writ of error coram nobis must issue to correct the judgment that the court never had power to enter." *Peter*, 310 F.3d at 712.

/s/ Bruce Maloy_____
Georgia Bar No. 468525

/s/ Agne Krutules_____
Georgia Bar No. 141692
Maloy Jenkins Parker
75 Fourteenth Street, NW
25th Floor
Atlanta, GA 30309
(404) 875-2700 (phone)
(404) 875-8757 (facsimile)

## <u>CERTIFICATE OF SERVICE</u>

I certify that I have this day served a copy of PETITION FOR A WRIT OF ERROR CORAM NOBIS to all counsel of record in this matter via electronic filing.

This 6th day of September, 2012.

/s/ Bruce Maloy
Georgia Bar No. 468525
Maloy Jenkins Parker
75 Fourteenth Street, NW
25th Floor
Atlanta, GA 30309
(404) 875-2700 (phone)
(404) 875-8757 (facsimile)